In re ASTRI INVESTMENT, MANAGEMENT & SECURITIES CORPORATION t/a Aimas Securities Corp.

The BALTIMORE SUN COMPANY and Brian Sullam, Appellants,

v.

ASTRI INVESTMENT MANAGEMENT & SECURITIES CORPORATION t/a Aimas Securities Corp., Appellee.

Civ. No. K–87–2296.

United States District Court, D. Maryland.

July 13, 1988.

Craig E. Smith, Richard L. Wasserman, Kathleen M. McDonald, Venable, Baetjer and Howard, Baltimore, Md., for appellants.

James A. Vidmar, Jr., Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for appellee.

FRANK A. KAUFMAN, Senior District Judge.

This is an appeal by The Baltimore Sun from an order of the United States Bankruptcy Court (Schneider, J.) denying a Sun reporter's request to attend a creditors' meeting involving Astri Investment Management and Securities Corporation (Astri) as the debtor in a bankruptcy proceeding. The question presented—whether the members of the public have a right to attend a creditors' committee meeting—is seemingly one of first impression.

### I.

### *Background*

On May 28, 1987, Astri filed a voluntary petition under Chapter 7 of the Bankruptcy Code.[1] After an interim trustee was appointed, the Bankruptcy Court, on June 9, 1987, ordered that a meeting of creditors, pursuant to 11 U.S.C. § 341(a), be held on July 17, 1987 in United States Bankruptcy Court at the Federal Courthouse in Baltimore, Maryland. Prior to the time set for

---

1. 11 U.S.C. § 101 *et seq.* (1982 & Supp. IV 1986).

the meeting, an attorney from the Office of the Securities Commission of the State of Maryland and a reporter from the Baltimore Daily Record, the legal newspaper serving the Baltimore area, sought access to that meeting. Both were excluded from the meeting by order of the Bankruptcy Court after Astri's representative objected to their presence. The creditors' meeting commenced on July 17, 1987 and was continued to July 22, 1987. On July 21, 1987, Judge Schneider denied a motion by the State of Maryland for reconsideration of the exclusion order.[2]

On July 22, 1987, a Sun reporter came to the scene of the creditors' meeting and sought entrance despite the Bankruptcy Court's earlier exclusion decisions. Judge Schneider postponed the meeting, held a hearing that same day, and permitted the Sun to move to intervene to assert a right of access to the meeting for newsgathering purposes.[3] Judge Schneider denied the Sun's request, noting that he could find "no right in general of any person off the street to walk in and sit down at a meeting of creditors."[4] The creditors' meeting was postponed to and concluded on August 26, 1987.

## II.

### *Mandamus*

■ The Bankruptcy Court's decision to deny to the Sun access to the creditors' meeting involves an issue of law which would be reviewable pursuant to 28 U.S.C. § 158, *see Yadkin Valley Bank & Trust Co. v. McGee*, 819 F.2d 74, 75 (4th Cir. 1987); *Caswell v. Lang*, 757 F.2d 608, 609 (4th Cir.1985), if the Sun had been a party to the case in the Bankruptcy Court. Astri has not questioned whether the Sun, as a non-party asserting First Amendment rights, may note an appeal under § 158. However, this Court raises that question *sua sponte. See Central South Carolina*

*Chapter, Soc'y of Professional Journalists v. Martin*, 556 F.2d 706 (4th Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978). In *Central South Carolina Chapter*, Judge Widener indicated that mandamus is the appropriate way for the media to seek appellate review of an order restricting the reporting of statements and actions of the participants in a pending criminal trial. 556 F.2d at 707. In *In re Washington Post Co.*, 807 F.2d 383 (4th Cir.1986), Judge Murnaghan, in another criminal case, wrote that "an appeal would be treated as a petition for mandamus if the party seeking review has standing and has substantially complied with the requirements of Fed.R.App.P. 21(a) concerning mandamus." *Id.* at 388 (footnote omitted). The papers filed by the Sun in support of this appeal to this Court substantially comply with the mandamus requirements of Rule 21(a), which provides in relevant part:

> Application for a writ of mandamus or of prohibition directed to a judge or judges shall be made by filing a petition therefor with the clerk of the court of appeals with proof of service on the respondent judge or judges and on all parties to the action in the trial court. The petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the issues presented and of the relief sought; a statement of the reasons why the writ should issue; and copies of any order or opinion or parts of the record which may be essential to an understanding of the matters set forth in the petition.

This Court, in the absence of a Local Rule to the contrary, will follow the standards of Fed.R.App.P. 21(a).

As to standing, the Sun has suffered "an injury '... that is likely to be redressed by a favorable decision.' " *Central South*

---

2. Neither the State of Maryland nor the Daily Record sought reconsideration of the decision of the Bankruptcy Court to exclude their reporters from the creditors' meetings, and neither is a party to this appeal.

3. *See* Appellants' Appendix at 5.

4. *Id.* at 17. The Bankruptcy Court orally denied the Sun's motion to intervene at the conclusion of the July 22, 1987 hearing, after ruling against the Sun on the merits of the access issue.

*Carolina Chapter,* 566 F.2d at 707–08 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). Accordingly, the Sun's appeal in this case will be treated as a petition for a writ of mandamus.

### III.

#### Mootness

▪ Astri contends that the Sun's request for relief has become moot because the meeting to which the Sun sought access has been concluded and because no further creditors' meeting in the Astri bankruptcy is scheduled. However, an exception to the mootness doctrine exists for claims which might be "defeated by short term orders, capable of repetition yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Thus, mootness is not present when the challenged order cannot be fully litigated prior to the conclusion of the judicial proceeding involved and when a "reasonable expectation [exists] that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *Gannett Co., Inc. v. De Pasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976).

**5.** That is, by seeking a writ of mandamus in this Court. *See* Part II of this Opinion, *supra.*

**6.** The cases dealing with access to court documents specifically indicate that both common law and First Amendment rights are involved. *See, e.g., Rushford v. The New Yorker Magazine, Inc.,* 846 F.2d 249 (4th Cir.1988). The burden of justifying the sealing of court documents is heavier in relation to the First Amendment than to the common law. There are seemingly no cases in which the Supreme Court or any federal court has specifically stated that common law rights are implicated in the context of access to court proceedings, although *Richmond Newspapers,* 448 U.S. at 564–69, 100 S.Ct. at 2820–23, extensively addresses English and American

▪ Bankruptcy Rule 2003 provides that a meeting of creditors must be held between 20 and 40 days after the issuance of an order for relief. A little more than a month passed between the July 22, 1987 date when the Sun first sought access and August 26, 1987, when the creditors' meeting concluded. Since its only avenue of relief would have been an expedited review—a requirement "which would of course make the 'evading review' test virtually impossible to meet," *In re Reporters Committee for Freedom of the Press,* 773 F.2d 1325, 1329 (D.C.Cir.1985)—the Sun's only way further to assert its views with regard to Judge Schneider's exclusion order was by seeking review in this Court.[5] The Sun, as a major newspaper, can be expected to try to cover newsworthy creditors' committee meetings in the future. Thus, the question of access to such proceedings is very likely to arise again. *See Globe Newspaper v. Superior Court,* 457 U.S. 596, 602–03, 102 S.Ct. 2613, 2617–18, 73 L.Ed.2d 248 (1982). Accordingly, the Sun's request for review in this Court is not moot.

### IV.

#### Public Access to Trials

▪ The press and public have qualified common law and First Amendment rights of access to criminal trials, *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980),[6] and to some preliminary proceedings in a criminal case. *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629

common law practices regarding public access to criminal trials. In any event, there would appear no reason to treat access to court proceedings in a different manner than access to court documents. Accordingly, this Court treats the question presented in this case as involving both common law and First Amendment standards. However, as did the Sixth Circuit in *Brown and Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1176 (6th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984), in dealing with a sealing order, this Court concludes that Judge Schneider's exclusion order cannot withstand scrutiny under either standard.

(1984) (*Press–Enterprise I*) (voir dire proceedings); *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*) (preliminary hearings before a magistrate required by California statute). In each case, whether members of the public have a constitutional right to be present at a particular court proceeding turns on the answers to two inquiries: first, "whether the place and process have historically been open to the press and general public," and, second, "whether public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. If a proceeding meets these tests of "experience and logic," *id.* at 9, 106 S.Ct. at 2741, a presumption of a right of public access exists which

> may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 9–10, 106 S.Ct. at 2741 (quoting *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824). In *Richmond Newspapers,* the Supreme Court reviewed the history of criminal proceedings in Anglo–American jurisprudence and concluded that criminal trials had always been open to the public. 448 U.S. at 569–73, 100 S.Ct. at 2823–25. Chief Justice Burger also noted that open criminal trials enhance the quality and safeguard the integrity of factfinding, assure an appearance of fairness, function as a check on the judicial and governmental process, and serve a socially therapeutic role by permitting citizens to observe justice being done. *Id.* at 569–72, 100 S.Ct. at 2823–25. Voir dire proceedings historically have been open to the public because the openness of jury selection helps to insure the fairness of and public confidence in

criminal trials. *Press–Enterprise I,* 464 U.S. at 505–08, 104 S.Ct. at 821–23. Similarly, preliminary hearings in criminal cases have usually been conducted in the open, and have been closed only for good cause. *Press–Enterprise II,* 478 U.S. at 10–11, 106 S.Ct. at 2741–42.[7]

In *In re Washington Post Co.,* 807 F.2d 383 (4th Cir.1986), the press sought access to plea and sentencing hearings in an espionage case where "national security interests [were] at stake." *Id.* at 391. Judge Murnaghan noted that plea and sentencing hearings "arguably fall within the scope of the right of access to criminal *trials,* which is clearly guaranteed by *Richmond Newspapers* and *Globe Newspaper Co.,*" and concluded that "historical and functional considerations weigh[ed] in favor of finding a right of access" in that case. *Id.* at 389 (emphasis supplied).

This appeal involves a civil case. In *Richmond Newspapers,* Chief Justice Burger stated that "[w]hether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open." 448 U.S. at 580 n. 17, 100 S.Ct. at 2829 n. 17. Justice Stewart, in his concurring opinion, wrote that "the First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal." *Id.* at 599, 100 S.Ct. at 2839 (footnote omitted). Nevertheless, the Supreme Court has not yet held that members of the public have a presumptive right of access to civil proceedings. However, several Courts of Appeals, noting that the Supreme Court's own historical review indicates that civil trials have always been presumptively open and that concerns for fairness, integrity and public confidence apply in the civil as well as in the criminal context, have extended the presumption of openness to civil cases. *See Westmoreland v. CBS,* 752 F.2d 16, 23 (2d Cir.1984), *cert. denied,* 472 U.S. 1017,

---

7. The same approach has been followed with respect to other pretrial proceedings in criminal cases. *See In re Application of the Herald Co.,* 734 F.2d 93, 99 (2d Cir.1984) (suppression hearing); *United States v. Criden,* 675 F.2d 550, 554 (3d Cir.1982); *United States v. Chagra,* 701 F.2d 354, 363–64 (5th Cir.1983) (bail hearing); *United States v. Brooklier,* 685 F.2d 1162, 1169–71 (9th Cir.1982) (suppression hearing).

105 S.Ct. 3478, 87 L.Ed.2d 614 (1985); *Publicker Industries, Inc., v. Cohen,* 733 F.2d 1059, 1067–71 (3d Cir.1984); *In re Continental Illinois Securities Litigation,* 732 F.2d 1302, 1308–10 (7th Cir.1984); *Brown and Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1178–79 (6th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984).[8]

The Fourth Circuit recently held that certain pleadings and documents submitted in a civil case in support of a defendant's successful motion for summary judgment should not have been kept under seal after the motion was decided, without compliance with certain procedural and substantive standards. In that case, *Rushford v. The New Yorker Magazine,* 846 F.2d 249 (4th Cir.1988), Judge Murnaghan outlined those standards as follows:

> With regard to substantive requirements, we find it necessary to decide whether the interests of The Washington Post arise from the First Amendment or from the common law right of access. The common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment. Under common law, there is a presumption of access accorded to judicial records. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 [98 S.Ct. 1306, 1311, 55 L.Ed.2d 570] (1978). This presumption of access, however, can be rebutted if countervailing interests heavily outweigh the public interests in access. The trial court may weigh "the interests advanced by the parties in light of the public interests and the duty of the courts." *Id.* at 602. The party seeking to overcome the presumption bears the burden of showing some significant interest that out-

weighs the presumption. *Hotel Rittenhouse Assoc.,* 800 F.2d [339], 344 [ (3d Cir.1986) ]. The trial court's denial of access to documents is then reviewed only for abuse of discretion. *Nixon,* 435 U.S. at 597–99 [98 S.Ct. at 1311–13].

Under the First Amendment, on the other hand, the denial of access must be necessitated by a compelling government interest and narrowly tailored to serve that interest. *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 [104 S.Ct. 819, 824, 78 L.Ed.2d 629] (1984); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607 [102 S.Ct. 2613, 2620, 73 L.Ed.2d 248] (1982); *In re Washington Post Co.,* 807 F.2d at 390. In *In re Washington Post Co.,* this Court held that the more rigorous First Amendment standard should apply to documents filed in connection with plea hearings and sentencing hearings in criminal cases. 807 F.2d at 390. We believe that the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case. *See Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059, 1067–71 (3d Cir.1984) (the First Amendment guarantees to the public and to the press the right of access to criminal and civil trials); *In re Continental Illinois Sec. Litig.,* 732 F.2d at 1308 (the policy reasons for granting public access to criminal proceedings apply to civil cases as well). Therefore, to limit The Washington Post's access to the documents submitted in connection with the summary judgment motion, there must be a showing, in the first instance by the district court, that the denial serves an important governmental interest and

---

**8.** The plaintiff in *Brown and Williamson* sought a federal court order restraining the Federal Trade Commission (FTC) from publishing certain information concerning cigarettes in the Federal Register. The district court issued a temporary restraining order, and, *inter alia,* "ordered that the administrative record and other documents filed by the FTC be placed under seal." *Id.* at 1169. With respect to that portion of the district court's order, the Sixth Circuit wrote:

The Public Citizen Health Research Group has filed a comprehensive amicus brief opposing this action, and Brown and Williamson has ably defended it. Because of its importance, we reach the question on our own motion. Under the First Amendment and the common law, we conclude that the District Court erred by failing to state findings or conclusions which justify nondisclosure to the public. The order of the District Court sealing the documents in the case is, therefore, vacated. *Id.* at 1176.

that there is no less restrictive way to serve that governmental interest. *See Globe Newspaper Co.*, 457 U.S. at 606–07 [102 S.Ct. at 2619–20]; *Publicker Industries, Inc.*, 733 F.2d at 1070.

846 F.2d at 253. *Rushford* sets forth the substantive standards for applying the qualified right of access of the public to attend a creditors' committee meeting *if* such a right exists with regard to such meetings.[9] However, to date, as far as this Court knows, no federal court has determined that the public has or does not have any right of access to bankruptcy proceedings. Accordingly, it is necessary in this opinion to examine bankruptcy's historical roots and to analyze present policy needs with respect to access to such proceedings.

### V.

*Bankruptcy—The Historical Experience*
#### A. *General*

A bankruptcy case is a civil proceeding conducted under the supervision of the district court. 28 U.S.C. § 1334(a) gives to the district courts original and exclusive jurisdiction over *"all* cases arising under title 11" (emphasis added); § 1334(b) gives to the district courts original, but not exclusive, jurisdiction over "all civil proceedings in cases arising under title 11, or arising in or related to cases under title 11." A bankruptcy "case" commences with the filing of a bankruptcy petition; a bankruptcy "proceeding" includes any event in the bankruptcy case. *See* 1 *Collier on Bankruptcy* ¶ 3.01[c][i] and [ii] (15th ed. 1987).

Astri argues that this Court should view a creditors' meeting as the equivalent of a discovery proceeding in a civil trial. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). That contention is not persuasive. In *Rushford*, the Fourth Circuit was asked by the party opposing unsealing of certain summary judgment documents to rely upon *Seattle Times*. Rejecting that approach, Judge Murnaghan concluded:

> We find The New Yorker's reliance on *Seattle Times v. Rhinehart*, 467 U.S. 20

[104 S.Ct. 2199, 81 L.Ed.2d 17] (1984) to be unpersuasive. In *Seattle Times*, the Supreme Court merely held that the First Amendment did not preclude the district court from entering a protective order limiting disclosure of the products of pretrial discovery. *Id.* at 37 [104 S.Ct. at 2209]. However, such discovery, which is ordinarily conducted in private, stands on a wholly different footing than does a motion filed by a party seeking action by the court. *See Bank of American Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assoc.*, 800 F.2d 339, 343 (3d Cir.1986). The counsel for The New Yorker even acknowledged that if the case had gone to trial and the documents were thereby submitted to the court as evidence, such documents would have been revealed to the public and not protected under the Order. Because summary judgment adjudicates substantive rights and serves as a substitute for a trial, we fail to see the difference between a trial and the situation before us now.

846 F.2d at 252.

Insofar as *Seattle Times* is concerned, it is also necessary to note that while both discovery and a creditors' meeting are primarily concerned with obtaining information, the two proceedings have much different historical backgrounds. Discovery is a pretrial process conducted principally by the parties with varying degrees of court supervision; a creditors' meeting is a formal part of a Chapter 7 bankruptcy, mandated by 11 U.S.C. § 341(a), supervised by a court clerk, and a proceeding at which substantive rights of creditors are often affected.

#### B. *History*

American bankruptcy law is firmly rooted in English soil, as Justice Holmes noted in 1911 when he wrote that "[w]e take our bankruptcy system from England, and we naturally assume that the fundamental principles upon which it was administered were adopted by us when we copied the system." *Sexton v. Dreyfus*, 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911).

---

**9.** The procedural requirements discussed in *Rushford* are not at issue in this appeal.

The first English bankruptcy statute was enacted in 1542, during the reign of Henry VIII, and gave to the Lord Chancellor of England and other members of the Privy Council the power to summon for examination persons indebted to, or holding property owned by, the bankrupt. *See* 34 and 35 Hen. VIII, ch. 4 (1542–43), *quoted in* 1 H. Remington, *A Treatise on the Bankruptcy Law of the United States* 9–10 (2d ed. 1915). That first statute was "concerned wholly with fraudulent debtors, not at all with those who are simply unfortunate," Remington, *supra,* at 8, and was quasi-criminal in nature. The purpose of the examination of witnesses was to uncover all of the assets of the bankrupt for distribution to creditors. Unfortunately, historical research to date does not seem to have revealed whether the examination of witnesses was or was not conducted in public; there is, however, no indication that the general openness of criminal and civil proceedings in English legal practice was dispensed with in connection with bankruptcy matters.

It was not until 1869 that the debtor became subject in England to examination. Under the 1869 statute, the bankrupt was required to "produce a statement of his affairs to the first meeting of creditors, and submit to be publicly examined thereon on a day to be named by the court, and at such adjourned public examination as the court may direct." G. Robson, *A Treatise of the Law of Bankruptcy* 447 (1870). The 1869 law also called for the examination of the bankrupt to be conducted in open court, not in chambers. *Id.* at 448. Section 17 of that Act provided that the court hold a "public sitting" at which the debtor "shall be examined as to his conduct, dealings, and property." Bankruptcy Act of 1869 § 17, *quoted in* W. Hazlitt & R. Ringwood, *The Bankruptcy Act of 1883 and the Bankruptcy Rules and Forms, 1886* 18 (2d ed. 1887). Public examination of the debtor has continued into modern times as a fea-

ture of English bankruptcy law. "The public examination had traditionally been regarded [in England] as one of the most important aspects of the bankruptcy process, for it is intended to serve one of the main purposes of public policy associated with bankruptcy law, namely the protection of the public by gathering as much information as possible about the debtor and his affairs." I. Fletcher, *Laws of Bankruptcy* 111 (1978) (footnote omitted).[10] It is to be noted, however, that in Great Britain the practice of public examination of the bankrupt developed separately from the procedure concerning creditors' meetings. The former was always open to the public; the historical record available to us is largely silent regarding public access to the latter.

The American colonies apparently

> never had any laws that could technically be called bankruptcy laws. Pennsylvania, however, had passed "an act for the Regulation of Bankruptcies" in 1785. In addition, Pennsylvania, like most of the other states, had insolvency laws. These laws were not uniform; nor did they furnish adequate coverage.... It was inevitable that Congress would be called upon to exercise its legislative power over the subject of bankruptcies.

1 *Collier on Bankruptcy* ¶ 0.03 (14th ed. 1974). American federal bankruptcy law was first established by the Bankruptcy Act of 1800, and was reestablished and developed by the Acts of 1841, 1867, 1898, 1935 and 1978. Section 18 of the Act of 1800 required the bankrupt to appear and to be examined by a commissioner appointed by the district court to oversee the bankrupt's assets.[11] Section 52 of the Act permitted "any creditor" to attend the court examinations of the bankrupt and to participate in the proceedings.[12]

The Act of 1841 provided for examination of the bankrupt "in and before [the] court, or any commission appointed by the court

---

10. Great Britain's Insolvency Act of 1976 retains the feature of public examination, although it allows the Official Receiver to apply to the court for dispensation with such examination. *See* Insolvency Act of 1976, ch. 60, § 6; *see also* Fletcher, *supra,* at 112, 113–15.

11. Bankruptcy Act of 1800 § 18, 2 Stat. 19, 26 (1800).

12. *Id.* § 52, 2 Stat. at 34.

therefor." [13] The Act also stated that after a hearing had been scheduled with regard to a 'petition for bankruptcy, "all persons interested may appear at the time and place where the hearing is thus to be had, and show cause, if any they have, why the prayer of the said petitioner should not be granted." [14]

The first three Bankruptcy Acts were short-lived. The Act of 1800 was repealed in 1803; the Act of 1841 was repealed in 1843; and the Act of 1867 was repealed in 1878. The Bankruptcy Act of 1898,[15] however, established the foundations of modern bankruptcy law. Section 55(a) of the 1898 Act gave to each federal district court the responsibility to "cause the first meeting of the creditors of a bankrupt to be held" [16] and § 55(b) required the judge or referee to preside, and gave to either officer the discretion to "publicly examine the bankrupt".[17]

The Act of 1898 contains the first statutory reference to a "public" examination of the bankrupt. The sixth edition of *Collier on Bankruptcy* noted "[t]hat all meetings [under Section 55] should be held in courtrooms and on regular days and at regular hours, and be conducted with dispatch, dignity and impartiality on the part of the presiding officer, in short, as a court of justice, seems to be the purpose of the statute." *Collier on Bankruptcy* 419 (6th ed. 1907) (footnotes omitted).

The Act of 1938 amended § 55(b) to *require* that the judge or referee "publicly examine the bankrupt or cause him to be examined and [to provide that the judge or referee] may permit creditors to examine him [the bankrupt]." [18]

Section 55 of the Act, as amended in 1938, should be read in tandem with § 21(a) of the 1898 Act,[19] which permitted the court, upon the application of any officer, bankrupt or creditor, to order *any* designated persons to appear before the court for examination regarding the bankrupt's assets during *any* stage of the proceeding. Section 21(a) specifically authorized examination of the bankrupt. In *In re Winston Shirt Corp.*, 104 F.2d 777, 780 (3d Cir. 1939), the issue was whether a creditor was entitled to receive a copy of the testimony of a witness taken at a § 21(a) hearing. In deciding that the creditor was so entitled, Judge Biggs wrote:

> Moreover, we entertain no doubt that the examination of witnesses pursuant to the provisions of Section 21(a) of the Bankruptcy Act must take place at a public hearing.
>
> Such is the case because the referee in conducting the hearings serves as the court and the processes of the court are available to compel the attendance and testimony of witnesses. Such hearings cannot be conducted in camera. Counsel for interested persons are entitled to examine the proceedings. Under circumstances similar to those of the case at bar, it has been held that a creditor or even the bankrupt himself is entitled to examine the testimony given at hearings as well as books and records in the possession of the trustee.

*Id.* See, e.g., *Petition of Moulthrop*, 249 F. 468 (6th Cir.1918); *In re Samuelsohn*, 174 F. 911 (W.D.N.Y.1909); *In re Saur*, 122 F. 101 (S.D.N.Y.1903).

In *In re Prussian*, 255 F. 857 (D.Mich. 1919), the referee had excluded from a § 21(a) proceeding involving the examination of a creditor an attorney who represented both that creditor and the bankrupt. Commenting upon the referee's suggestion that the presence of the attorney would be

---

**13.** Bankruptcy Act of 1841, § 4, 5 Stat. 440, 444 (1841).

**14.** Bankruptcy Act of 1841, § 7, 5 Stat. 440, 446 (1841).

**15.** 30 Stat. 544 (1898).

**16.** *Id.* at 559. Thus, while under the earlier Bankruptcy Acts, any creditor apparently was permitted to attend the examination of the debtor conducted by an officer of the court and offer testimony, the first reference to a "first meeting of creditors" is in the Act of 1898.

**17.** *Id.*

**18.** 52 Stat. 840, 865 (1938).

**19.** Bankruptcy Act of 1898, § 21(a), 30 Stat. 544, 553 (1898).

improper, the district court wrote, *inter alia:*

> The contention really amounts to this, that the examination provided by section 21(a) should be held to be a secret inquisition, at which only certain persons may be present. Aside from the inherent difficulty in determining just who might and who might not attend such examination, it is not clear by what authority a trustee in bankruptcy, or even the referee or court, could convert this bankruptcy proceeding, held in a court, with witnesses sworn and testifying, subject to examination and cross-examination in conformity with the rules of law, into a secret session at which certain parties, having rights which may be affected by the questions asked or the answers given at the hearing, may be compelled to attend, but from which their counsel, and other parties having rights involved in such proceeding, together with their counsel, may be excluded. Counsel have not pointed out any provision in the Bankruptcy Act justifying such a construction of the statute or rules applicable, and I know of none. The provisions already mentioned seem to clearly indicate that a contrary construction is the proper one.

*Id.* at 859–60. *See* 2 *Collier on Bankruptcy* ¶ 21.2 (14th ed. 1978) ("Despite intimations to the contrary, a § 21(a) examination should be conducted at a *public* hearing, and not as a private investigation.") (emphasis added); 5 Remington, *supra*, at 59–61 ("Examinations under § 21(a) are not secret inquisitions at which only certain persons may be present, but are *public* proceedings.") (emphasis added).

While both § 21(a) and § 55(b) are very similar in that they provide for examination of the bankrupt, some courts have emphasized that § 21(a) is essentially a discovery proceeding whereas in the § 55(b) proceeding the rights of creditors may be affected.

Thus, in *In re Emigh*, 243 F. 988 (N.D.N.Y.1917), the court wrote:

> At the first meeting of creditors, of which all creditors have notice ... and at all adjournments thereof, the bankrupt may be examined. Witnesses may be examined and proof taken as to claims. *These proceedings should be open to the public*, and the bankrupt is then and there entitled to counsel. While the witnesses are publicly sworn and examined at such a meeting, they are not entitled to counsel, except when in the discretion of the referee or court counsel ought to be permitted. But special examination of the bankrupt and of his wife and of witnesses under special order pursuant to the provisions of section 21a are a different matter, and are had for a different purpose. The two proceedings should not be confused or conducted the one as a part of the other. These special examinations, while a proceeding in the case before the referee or judge, are not a part of the open court proceedings proper and ought not to be. If so conducted the object and purpose of such examination will be defeated.

*Id.* at 991 (emphasis added). At this juncture of this case, the court is not called upon to agree or disagree with the distinction between sections 55(b) and 21(a) drawn by the court in *In re Emigh*, and simply notes that the court's views in that case with respect to section 55(b) support the media's position in this case.

Congress revised the entire bankruptcy law when it enacted the Bankruptcy Reform Act of 1978. In that Act, meetings of creditors are addressed at 11 U.S.C. § 341, which provides:

> (a) Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors.
>
> (b) The United States trustee may convene a meeting of any equity security holders.
>
> (c) The court may not preside at, and may not attend, any meeting under this section including any final meeting of creditors.

The removal of the court from the role of presiding at or attending creditors' meetings constituted a major renovation and reflected a policy change designed "to re-

move the court from administrative matters and to end its involvement in situations in which the court learns information outside of the context of a dispute on which it may eventually rule." 2 *Collier on Bankruptcy* ¶ 341.01[3] (15th ed. 1988). However, the fact that a United States trustee now presides at creditors' meetings does not change the essentially judicial character of the proceedings; nor did the Congress give any indication in enacting the 1978 law that it sought to change any historical practice relating to public access.

Section 343 of the 1978 Act continues the practice of requiring the debtor to "appear and submit to examination under oath at the meeting of creditors." 11 U.S.C. § 343. Section 343 is the successor to § 55(b) of the prior Act; the most significant difference between the two sections for purposes of this case is the absence in section 343 of any reference to a *public* examination of the debtor.[20] Again, however, it must be noted that there is no indication in the legislative history that that wording change was intended to alter historical practices concerning public access to creditors' meetings.

Since 1800, our federal bankruptcy proceedings have always been conducted under the aegis of a federal court. Also, the bankruptcy statutes have required that records of such proceedings be filed with the clerk of the district court.[21] Current Bankruptcy Rule 2003 requires the electronic taping of testimony at creditors' meetings and provides that such tapes are part of the public record and are available for transcription upon order of a member of the public. The trustee's memorandum regarding the creditors' meeting is also filed in the court records and is available for public review. Thus, a member of the public, including a representative of the press, may have access to the transcript and records of a creditors' meeting. In that context, it would seem that a member of the public, including a member of the press, should also have the right to attend a creditors' meeting unless problems of disruption or the like are likely to occur. The likelihood of the occurrence of such problems would appear slight, and further would seem to be as controllable as in any other court proceeding. Indeed, the press has attended, apparently without any disruptive effects, meetings of creditors in certain major bankruptcies in the District of Maryland and elsewhere in the Fourth Circuit. *See, e.g., In re Governmental Financial Services, Inc.*, No. 87–4–3357 (Bankr.D.Md.); *In re A.H. Robins Co., Inc.*, No. 85–01307–R (Bankr.E.D.Va.); *In re PTL (Heritage Village Church and Missionary Fellowship, Inc.*, No. 87–01956 (Bankr.D.S.C.).[22] In sum, historical analysis of English and American practices would appear to support the media's position in connection with the issue posed by this case.

### C. *Function and Policy*

The second prong of the Supreme Court's experience and logic analysis is whether access by the public and press to the proceedings plays a significant role in the functioning of the bankruptcy process. *See Press Enterprise II*, 478 U.S. at 8–9, 106 S.Ct. at 2740–41. A policy of openness " 'enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the [criminal law] system.' " *Id.* at 13, 106 S.Ct. at 2743 (quoting *Press Enterprise I*, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984)). Similarly, unless creditors' meetings are open, members of the

---

20. Section 343 provides:

    The debtor shall appear and submit to an examination under oath at the meeting of creditors under section 341(a) of this title. Creditors, any indenture trustee, any trustee or examiner in the case, or the United States trustee may administer the oath required under this section.

11 U.S.C. § 343 (Supp. IV 1986).

21. *See, e.g.,* Bankruptcy Act of 1800, § 51, 2 Stat. 19, 34 (1800); Bankruptcy Act of 1841, § 13, 5 Stat. 440, 448 (1841); Bankruptcy Act of 1867, § 38, 14 Stat. 517, 535 (1867); Bankruptcy Act of 1898, § 42, 30 Stat. 544, 556–57 (1898); 11 U.S.C. § 107(a) (1982).

22. Stipulation of Supplemental Facts ¶ 5.

public including the press have no way to monitor the supervision of the case by the trustee or to assure that bankruptcy policies and procedures are applied appropriately. As the Supreme Court has noted, "[p]eople in an open society do not demand infallibility from their institutions but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572, 100 S.Ct. at 2825.

The meeting of creditors is an important part of a bankruptcy case—indeed, in Chapter 7 and 11 proceedings, it is the only mandatory hearing. Creditors have an opportunity to appear and to present claims, to examine the debtor, and to participate in discussions regarding the outcome of the bankruptcy. *Cf. Press–Enterprise II*, 478 U.S. at 12, 106 S.Ct. at 2742 ("Because of its extensive scope, the preliminary hearing is often the final and most important step in the criminal proceeding"). The public has an interest in attending such a critical component of a bankruptcy, particularly in a case like this one in which the debtor is a corporation whose bankruptcy affects large numbers of people, indirectly as well as directly. Astri, the bankrupt in this case, is a securities dealer-broker, a type of business which has been under intense federal and state scrutiny for a number of years.[23]

One purpose of the examination of the debtor at a creditors' meeting has always been to uncover all of the debtor's assets, by the obtaining of full and truthful information. Truthfulness by the bankrupt is probably enhanced when the bankrupt testifies in public. In addition, openness will seemingly increase the likelihood that all potential creditors are made aware of the

bankruptcy proceedings and are afforded the opportunity to present claims.[24]

## VI

### Conclusion

■■■ Both the history and the function and policy of our bankruptcy laws require the conclusion that a presumptive First Amendment right of access to creditors' meetings exists—a right which should not be denied unless, in a given case, there is a showing that a restriction of access "is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824. The record provides two possible reasons for a denial of access in this case: a concern (1) that the debtor would be less forthcoming regarding his financial situation in the presence of the press;[25] and (2) that the presence of noninterested parties might interfere with the orderly administration of the proceedings.[26] In this case, there is no evidence which suggests that either such reason should be accorded any special weight. *Compare In re Epic Associates V*, 54 B.R. 445, 447–449 (Bankr.E.D.Va.1985) ("cause existed" for the "extraordinary measure" of sealing records because of the possibility of a run on the institutions holding the debtors' securities). Therefore, the Bankruptcy Court should not have denied to appellants or to any member of the public access to the Astri creditors' meeting in the absence of any evidence specifying the need for closure or suggesting the unavailability of an alternative procedure less restrictive than a total ban on public access. *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824. Accordingly, this Court will issue an order vacating the Bankruptcy Court's order of July 22, 1987 denying the Sun's request for

---

**23.** The State of Maryland's Office of the Securities Commission sought access to the July 17, 1987 creditors' meeting, but was refused admission. The State argued before the Bankruptcy Court that in its capacity as *parens patriae* for the citizens of Maryland, it should be allowed access to the Astri creditors' meeting in order to enable the State to protect the welfare of its citizens from economic injury due to the conduct of the securities business by Astri and by others. *See* Appellants' Appendix at 56, 64.

**24.** At least three potential creditors, none of whom were listed by Astri prior to the creditors' committee meeting, have since come forward and expressed an interest in the bankruptcy case underlying this appeal. *See* Appellants' Appendix at 73–75.

**25.** Appellants' Appendix at 12.

**26.** Appellants' Appendix at 18.

access to the Astri creditors' meeting.[27]

---

**27.** Since the creditors' meeting has been held and concluded, it would be pointless for this court to remand this case to the Bankruptcy Court with instructions to vacate its said earlier order.