**In re Petition of Len B. BLACKWELL, et al., Debtor.**

**San Antonio Express–News, Darrin Schlegel, Appellants,**

**v.**

**Len B. Blackwell, et al., Appellees.**

**Civ.A. No. SA–00–CA–327–EP. Bankruptcy Nos. 99–53169, 99–53171, 99–53170, 99–53172.**

United States District Court, W.D. Texas, San Antonio Division.

May 4, 2000.

Mark J. Cannon, Clemens & Spencer, P.C., San Antonio, TX, for San Antonio Express News and Darrin Schlegel.

Patrick J. Neligan, Jr., Neligan Andrews & Foley, L.L.P., Dallas TX, for Len B. Blackwell and Christopher D. Johnson.

Keith E. Kaiser, Cox & Smith, Inc., San Antonio, TX, for Bancomer, S.A. as Trustee, Elimar Corporation, Ellyzon Enterprises, Inc., and Zondar Enterprises, Inc.

## ORDER

PRADO, District Judge.

On this date the Court considered Appellants San Antonio Express–News's and Darrin Schlegel's appeal of a bankruptcy court's decision to allow certain bankruptcy creditors to file their claims by identifying account numbers rather than names and the same court's decision to seal a portion of an evidentiary hearing on that issue. After careful consideration, the Court will reverse the court's decision and vacate the confidentiality order entered in this case.

### FACTS AND PROCEDURAL HISTORY

If the parties share any common ground at all, it is in their agreement that this case is extraordinarily complex. In 1999, insolvency proceedings were commenced against two investment entities, I.G. Services, Ltd., a Cayman Islands entity, and I.W.G. Services, Ltd., a United Kingdom entity, which are part of a broader investment group, InverWorld. Each insolvency proceeding was filed under the laws governing the entity's country of incorporation. Employees of Pricewaterhouse-Coopers have been appointed as foreign representatives/liquidators in both proceedings. Those representatives filed and sought ancillary relief in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. Such relief is available pursuant to section 304 of the Bankruptcy Code and helps guard against piecemeal resolution of cross-border insolvency proceedings.

The case has an extremely high public profile. In addition to the ancillary proceedings filed here and the two out-of-country insolvency proceedings, the United States Securities & Exchange Commission has filed an enforcement proceeding against two related United States entities. In addition, the Department of Justice has announced that it is engaged in an ongoing criminal investigation regarding the collapse of InverWorld.

The majority of the creditors who have appeared in the insolvency proceedings are residents of Mexico. Early in the proceedings, these investors, through counsel, expressed a concern that disclosure of their names could expose them to physical violence in their country. The investors claimed that this concern stemmed from an increasingly high rate of kidnapings of wealthy individuals in Mexico. Through counsel, some of the investors informed the Court that they were reluctant to file their claims and protect their interests if participation would subject them or their families to physical violence.

The bankruptcy court requested briefing on the issue and, on August 27, 1999, granted the investors' motion to enter a confidentiality order. Under the terms of that order, all Bankruptcy Rule 2019 notices would be permitted to be filed without disclosing the names of the investors and all proofs of claim would be filed using the investors' account numbers and the addresses of their attorneys. In addition,

the order prohibited the disclosure of the identity or address of any investor to a party or governmental agency, absent a specific order.

On September 29, 1999, Appellants, the *San Antonio Express–News* and editor Darrin Schlegel, filed a motion to vacate the confidentiality order, claiming that it violated constitutional and common law rights of access to court records, that it violated the Bankruptcy Code's own provisions regarding the issuance of a protective order, and that it was entered without a showing of good cause. In November, the bankruptcy court held a hearing on the motion. In response to the *Express–News's* argument that a nexus between disclosure and Mexican crime rates need be shown in order to justify the order, the Appellees offered the testimony of an unidentified investor, who testified that he feared for his safety and that of his family in Mexico and that he and other wealthy people there tried to maintain a low profile. He also testified that he knew of one investor who had publicly bragged about his wealth and had then been the victim of an attempted kidnaping. The investors also offered documentary evidence that their fear was warranted—a United States State Department Travel Warning and Consular Information Sheet and newspaper articles describing the increasingly high rate of kidnapings in Mexico. In addition, the investors offered a set of "declarations" from their attorneys stating that the investors had informed their attorneys of their fears and that they would refuse to participate in the proceedings if they could not maintain their confidentiality.

The bankruptcy court denied the motion to vacate and clarified the parameters of its original holding. The confidentiality order, as it is contested in this appeal, thus mandates that:

1. All Bankruptcy Rule 2019 notices may be filed by account number, rather than by name;

2. All proofs of claim, notices, and other documents may also be filed using account numbers;

3. No party may disclose investor identities and addresses unless a court enters an order allowing such disclosure.

In addition, the *Express–News* appeals the bankruptcy court's decision to seal a portion of the record. Specifically, the court decided that the live testimony of the investor should be heard in a closed courtroom. Accordingly, the court excused all non-parties from the proceedings, including an *Express–News* reporter. However, because the *Express–News* was a party to the suit, the Court permitted one of its editors, Darrin Schlegel, to remain in the courtroom. At the conclusion of the proceedings, the court sealed the record as to this testimony and orally announced that the *Express–News* could not publish the witness's name or other identifying information. However, upon discovering that Schlegel asserted status not just as an *editor*, but also as a *reporter* for the newspaper, the court, in its written order sealing the record, expanded the ruling to enjoin the *Express–News's* attorney from *disclosing* the relevant information to anyone. The court reasoned that the ruling did not interfere with the attorney-client relationship between counsel and the *Express–News* because it did not prohibit counsel from conferring with Schlegel, who the court concluded was the *Express–News's* corporate representative.

### DISCUSSION

This case divides itself neatly into two questions: does the bankruptcy court have the authority—derived from statute or its own inherent powers—to issue an

order allowing the creditors to maintain confidentiality of their names throughout the bankruptcy proceedings, and, if so, did the bankruptcy court correctly enunciate and apply the law in doing so? Because the Court has determined that the investors' asserted interest in maintaining privacy was not supported by evidence and therefore does not outweigh the newspaper's interest in disclosure, the Court will address only the second question.

As the briefs before the Court suggest, it is difficult to determine which First Amendment paradigm, if any, should be applied to these facts. As both the bankruptcy judge and the appellees note, this is not precisely a case involving access to court documents; rather, this case involves whether the newspaper can ask, on First Amendment or common law grounds, that bankruptcy documents be filed in the form anticipated by the rules. Thus it is not clear whether *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), strictly applies to these facts. In that case, the United States Supreme Court held that a court could not bar access to public records without a showing of good cause. *See Nixon*, 435 U.S. at 609, 98 S.Ct. 1306.

However, the Court agrees with appellants that some First Amendment interests are implicated in this claim. The United States Court of Appeals for the Fifth Circuit considered an analogous issue in *Doe v. Stegall*, 653 F.2d 180 (5th Cir. Unit A 1981). In that case, two children filed a lawsuit challenging the constitutionality of prayer in Mississippi public schools and requested permission to bring their suit anonymously in order to protect them from a hostile community. *See Stegall*, 653 F.2d at 182. In deciding the issue, the Fifth Circuit first stated that the federal rule requiring plaintiffs to disclose their name in a lawsuit raises First Amendment implications: "First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings." *Id.* at 185.[1] The court stated that the proper analysis in cases where a party has asserted a need for anonymity is to balance "privacy concerns against the presumption of openness in judicial proceedings." *Id.* at 186.

In *Stegall*, the court considered several, non-exclusive, factors in determining that anonymity was warranted. First, it noted that the case involved religion, "perhaps the quintessentially private matter." *Id.* Next, the court stated that evidence in the record suggested that the family could expect reprisals, including violence, if the children's names were disclosed. *Id.* Finally, the court noted that the plaintiffs in *Stegall* were children and thus deserving of special protection. *Id.*

■ While the *Stegall* court explicitly refused to articulate a consistent formula for analyzing cases involving party anonymity, it does provide a general analytical framework. That framework begins with the presumption that parties will not proceed in public litigation anonymously. *See id.* (noting the "constitutionally-embedded presumption of openness in judicial proceedings"). The framework then calls for balancing that presumption with the privacy interests asserted by the moving party.[2]

---

1. Two rules requiring disclosure of names are applicable here. Federal Rule of Bankruptcy Procedure 2019 requires representatives filing on behalf of investors to disclose investor names and addresses, and rule 3001, requires that names be provided in proof of claim forms.

2. If this Court is wrong, and *Nixon* does provide the correct analytical paradigm for this case, the result is the same.

*See also In re Epic Assoc. V,* 54 B.R. 445, 448 (Bankr.E.D.Va.1985) (confidential orders in bankruptcy proceedings are "extraordinary"); *In re Foundation for New Era Philanthropy,* 1995 WL 478841, at *2 (Bankr.E.D.Pa.1995) (court begins with presumption that bankruptcy proceedings will be open and documents will be public); *In re Texaco, Inc.,* 84 B.R. 14, 17 (Bankr. S.D.N.Y.1988) (party seeking protective order must show good cause for such order); *In re Astri Invest.,* 88 B.R. 730, 735 (Bankr.D.Md.1988) (party attempting to overcome presumption of openness must show that a "significant interest" outweighs that presumption).

In this case, the investors claim they will be subjected to violence in Mexico if their names are disclosed in this litigation. Assertions of fear of violence are certainly relevant to the question of whether anonymity should be allowed. *See Stegall,* 653 F.2d at 186. However, the evidence in this case does not rise to the level of that offered in *Stegall.* There, the evidence supporting the plaintiffs' claims included documentary evidence that the litigants were specifically targeted for community harassment and violence, including statements that "Christians must beat the evil out of these people." *See id.* at 183 n. 6. The Court finds that the evidence here is not so persuasive. Even if the newspaper articles offered could be admitted to prove the matter asserted—that Mexico had experienced an increase in kidnapings of wealthy people—those articles did not sug-

gest that these plaintiffs specifically were, or would be, targeted.[3] For that matter, there is nothing in this record suggesting that an individual's decision to invest in the debtor entities necessarily indicates the level of that individual's wealth. There is nothing in this record suggesting what *percentage* of Mexico's wealthy people have been targeted by kidnapers. There is nothing in this record suggesting that all—or even a majority—of these investors have taken precautions to shield themselves from any perceived danger so that publication of their names would be the necessary cause of any violence against them. In short, while the newspaper articles and other documents submitted by the investors support a finding that the investors share a general fear of wealth-targeted violence, they do not support the investors' claims that these proceedings, or the publication of their names, increase their risk.[4] The single investor's testimony that he knew of another investor who, after advertising his wealth, was subject to a kidnaping attempt does not provide a basis in fact for the investors' fears. The evidence is not that this investor was targeted because of his InverWorld connection. Rather, he was targeted because he had made it known that he had a substantial amount of money. Other wealthy people in Mexico, not involved in the InverWorld disputes, face similar risks.[5]

The Court has considered the argument, supported by the affidavits of three attor-

---

**3.** The articles were certainly admissible as evidence supporting the investors' *perceptions.* It is not so clear that they were admissible for other purposes.

**4.** Indeed, evidence presented by the *Express–News* showed that some of these investors' names have appeared publicly, in articles or other legal proceedings, and there is no evidence that these investors suffered because of such publicity.

**5.** However, the Court finds the *Express–News's* argument that it is unlikely that kidnapers will "pore over" lists of investors to find victims somewhat disingenuous. Publication in the *Express–News* would, of course, make such studiousness unnecessary. The Court simply finds there is no evidence of an inclination among kidnapers to obtain these names.

neys in this case,[6] that confidentiality was needed to ensure that the investors would participate in these proceedings, and the Court finds that this argument is insufficient. The investors took certain risks when they decided to invest their money in these entities. The Court cannot serve as a general insurer that such risks will not be realized. Similarly, the parties' expectations under the laws of various other jurisdictions is not at issue here. Inver-World maintains its offices in the United States. It was at least foreseeable that the laws of this country could be applied to at least some disputes these parties could have contemplated at the time they made their investments.[7]

The Court has begun, as directed by the Fifth Circuit, with the presumption that the names of these investors must be made public. The Court has carefully considered the evidence offered by the investors to overcome this presumption. Included in the evidence considered were newspaper accounts, a United States travel warning, the testimony of an investor, and a rather remarkable letter written by a San Antonio law firm to an investor apprizing the investor of the United States's general presumption against confidential records. The Court has not considered the more than 100 affidavits reviewed in camera by the bankruptcy court. The bankruptcy court stated for the record that he did not rely on these affidavits, the affidavits are not part of the record, and the Court finds

that such reliance would most likely have been improper.

After reviewing the admissible evidence, as well as the evidence of questionable admissibility, the Court finds that the evidence, taken together, is inadequate for the task of rebutting a presumption of openness.[8] Therefore, the Court will order that the confidentiality order, in its entirety, be stricken.

ACCORDINGLY, it is ORDERED that the decision of the bankruptcy judge is reversed, and the confidentiality order is vacated and set aside in its entirety.

---

6. The Court is not convinced that these affidavits were admissible, but will assume for the argument that they were.

7. The Foreign Representative's brief acknowledges that U.S. law may be applicable for at least portions of this matter. *See Brief,* at 9.

8. The Court, does not by this ruling, mean to suggest that the *Express–News* has asserted a particularly strong public need for these

names. In fact, the *Express–News* has articulated *no* need beyond a generalized First Amendment interest, which it admittedly has. Indeed, the Court finds the asserted First Amendment interest here is fairly weak. The Court's conclusion that the interest must be upheld is thus based more on the inadequacy of the investor's asserted privacy interest than it is on the strength of the *Express–News's* case.