**In re Petition of Len B. BLACKWELL for the ESTATE OF I.G. SERVICES, LTD., Debtor in Foreign Proceeding.**

**In re I.W.G. Services, Ltd., Debtor.**

**Nos. 99–53169–C, 99–53171–C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Aug. 8, 2001.

MEMORANDUM DENYING INVESTOR ENRIQUE
MARCOS' REQUEST TO EXTEND THE TIME
TO FILE HIS PROOF OF CLAIM

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the Investor Enrique Marcos motion (1) to clarify this court's Order Fixing Bar Date, and (2) for an order extending the time period to file a proof of claim. After hearing the arguments and taking into consideration the applicable law, the court issued a bench ruling. This memorandum decision memorializes that bench ruling.

## INTRODUCTION

The beginnings and development of the Inverworld case are key to understanding the issues presented by Marcos's motion, and the court's disposition of those issues. The debtors and several affiliated companies (collectively "Inverworld") were part of an international groups of companies providing investment services to investors, most of whom are located in the Republic of Mexico. In mid–1999 Inverworld encountered serious financial difficulties.[1] As a result, two of the Inverworld entities, I.G. Services, Ltd., ("IGS") a Cayman Islands entity, and I.W.G. Services, Ltd., ("IWG") a United Kingdom entity, commenced insolvency proceedings under the respective laws of the countries of their incorporation. PricewaterhouseCoopers ("PwC") was appointed as liquidators in both cases. PwC promptly sought and obtained ancillary relief in this court pursuant to section 304 of the U.S. Bankruptcy Code, primarily to halt mounting collection activity by frustrated investors against the two entities.[2] Some investors, anticipating this move, filed their own petitions in this court, seeking to commence involuntary bankruptcy proceedings against IWG and IGS under the U.S. Bankruptcy Code (these petitions, by agreement of all parties, have been held in abeyance). About a month afterward, the Securities & Exchange Commission initiated a federal receivership in U.S. District Court. PwC was appointed receiver in those proceedings. By mid-August 1999, there were proceedings involving one or more Inverworld entities in four different courts and three different countries.

Fortunately, the same entity was the responsible fiduciary in all of the proceedings pending. Also (and again, fortunately), the lawyers representing a number of investors (representing, as it turns out, over 70% of the investment claims) organized themselves into an informal committee in order to be able to work in a more coordinated fashion. The committee came to be known as the Ad Hoc Creditors' Committee ("AHCC"). The AHCC did not formally retain counsel, but did, by agreement, delegate specific functions to different law firms that were participating in the AHCC. These developments allowed PwC to negotiate an overall administrative structure for the entire complex of cases pending in the various jurisdictions and courts. The structure permitted all of the parties to minimize conflicts and unnecessary litigation over jurisdiction, and also allowed the parties to allocate tasks not only amongst parties but amongst courts as well. The structure was negotiated over an extended period of time, commencing in September 1999.

During the course of negotiations between PwC (in its various capacities) and

---

1. A portion of these introductory facts were recounted in *In re I.G. Services, Ltd.*, 244 B.R. 377 (Bankr.W.D.Tex.2000), rev'd by *In re Blackwell*, 263 B.R. 505, 2000 WL 33348792 (W.D.Tex.2000).

2. On July 26, 1999, this court entered an Order Authorizing Joint Administration pursuant to Bankruptcy Rule 1015(b) consolidating for procedural purposes the § 304 proceedings for IGS and IWG which would be jointly administered under Case No. 99–53169.

the AHCC (sometimes operating as a unit, sometimes having to resolve internal issues first),[3] all parties concluded that the English proceeding (involving IWG) ought to be terminated. Even though many (perhaps most) of the investor claims were technically in the IWG case, the vast majority of the assets were in the IGS case then pending in the Caymans. IWG simply lacked the assets to support the cost of supporting an administration under the Insolvency Act of 1986 in England. The liquidators explained to the satisfaction of the English High Court that the structure negotiated between PwC and the AHCC would provide investors (most of whom reside in Mexico) with a more convenient and cost-effective forum to adjudicate their rights and claims. On March 7, 2000, the High Court agreed, and terminated the pending administration of IWG. To preserve the assets (and claimant interests) in IWG, the liquidators in the English proceeding were appointed as interim trustees in the parallel involuntary proceeding against IWG pending in this court. For administrative reasons, all parties agreed to hold in abeyance the formal adjudication of IWG.

This termination of the English insolvency proceeding greatly simplified the process of formalizing the structure that PwC and the AHCC had been negotiating over many months. The parties formalized their proposed administrative structure as a Protocol, and sought the approval and concurrence of the remaining three courts then exercising jurisdiction over the Inverworld entities—the court in Grand Caymans, the U.S. District Court, and this court. All three courts signed orders approving the proposed Protocol,[4] in effect agreeing to follow its structure as the "law of the case" that would control jurisdictional issues, assignment of responsibilities, conflicts resolutions, and the like.

The Protocol laid out multiple phases of administration, with Phase II given over to the claims process. It also allocated responsibility for the claims process to the U.S. Bankruptcy Court.[5] The parties had already recognized that resolution of the competing interests of investors would

---

3. The interests of investors in this case are by no means uniform, as is discussed *infra* in this opinion. Some investors claimed to hold proprietary interests that would allow them to simply reclaim their assets out of the estates without having to share with anyone else, while other investors (whose proprietary claims were either tenuous or entirely nonexistent) argued for liquidation of all assets and *pro rata* distribution. The disputes were sharpened by the harsh economic realities of the case—over $450 million in asserted investor claims, but less than $110 million in identifiable assets.

4. The purpose of the Protocol is to facilitate the administration of the pending proceedings involving IGS and IWG in separate jurisdictions (and to the extent necessary the proceeding involving the SEC Receivership).

5. The Protocol provided as follows:
"... the U.S. Bankruptcy Court is solely responsible for (a) approval and imple-

mentation of a process for adjudication of proprietary rights and ownership interests by investors; (b) approval of liquidation of assets including, but not limited to, the preservation of proprietary rights and ownership interest in those assets; (c) establishing and approving the process for the filing of proofs of claim by investors, entering an order setting out a bar date for all such claims and a bar date for asserting ownership interest or proprietary rights in specific assets; and (d) liquidation of any and all claims and adjudication of any and all ownership interest of investors in specific assets. In this regard, the U.S. Bankruptcy Court shall be solely responsible for approving the form of the proof of claim to be used by investors in connection with the filing of claims against IWG and IGS. All claims and ownership interests asserted by either IWG Investors or IGS Investors shall be filed as required by the U.S. Bankruptcy Court".
Protocol, at 14–15.

prove to be especially nettlesome. Some investors claimed to have proprietary rights in specific assets (such as, for example, stock in publicly traded companies held on account by an Inverworld entity), and wanted to insist on an outright transfer of "their property" back to them (resulting in a 100% recovery on their claims).[6] Other investors had purchased, through Inverworld, so-called "internal products,"[7] notes and other investment instruments originated and owed by one or more Inverworld entities. These investors recognized that the current market value of these products was close to zero, and so preferred that all assets of Inverworld be liquidated, and the proceeds distributed on a *pro rata* basis. The Protocol assigned resolution of these issues to this court, following such procedures as it might deem appropriate.

In addition, the liquidators faced the same issue that faces any fiduciary in any insolvency proceeding anywhere in the world—determining with precision how much each claimant is actually owed. The liquidators had an Inverworld "Account Statement" in their possession, dated July 2, 1999, which purported to list all of the Inverworld investors, the amount of the investments and whether the investment was for external or internal products (see discussion *supra*), but the liquidators were understandably reluctant to certify the Account Statement as true and correct. An independent verification of the approximately 1,500 investor accounts would be extraordinarily costly. The obvious solution, of course, was to require claimants to report what they believed they were owed, for PwC (and other interested creditors and investors) to review those claims, and to object to those claims that might be inconsistent with company records. In other words, the liquidators needed a claims resolution process that resembled the one set up in the U.S. Bankruptcy Code and its implementing rules.[8]

**6.** In these proceedings, these kinds of investments have come to be called "external products." In the Examiner's Report (discussed in text *infra*), the Examiner described external products like this:

[t]he investor would direct purchase of a specific amount of a specific security and pay a sum necessary for that purchase to Inverworld. The requested security would be purchased by ISI [InverWorld Securities, Inc.] from external sources of rom a store of such securities already in the name of IGS. The securities would not be segregated, but would be part of a general proof of securities held by the brokers with whom ISI dealt or by a clearinghouse like Cedel Luxemberg. In either case, all such securities were held in the name of IGS. The transfers to the investors took place only on the books of Inverworld, but thereafter the investor's monthly statement would show, for example, "1000 shares of AT & T," in the investor's account. The management agreements provided that Inverworld was entitled to hold such shares in common accounts, not segregated by owner, and to deal freely with such shares, the shares being segregated only by book entry. The agreements also stated that the shares so commingled might be held in the name of Inverworld at a broker or clearinghouse. Examiner's Report, at 8–9.

**7.** Here is how the Examiner's Report described "internal products":

[i]t does not appears that these investments related to any specific assets to be purchased or held by Inverworld, except for general statements that they were to involve assets relating to certain types of investments, as, for example, investments in "Tiger" economy companies in Asia. The Examiner understands and assumes that those investments were essentially investments in securities (especially promissory notes) issued by Inverworld and did not relate to specific assets to a legally relevant extent. If facts were stated that suggested to the contrary as to certain investors, the Report's conclusions with respect to those investors might be altered. Examiner's Report, at 10.

**8.** Another concern was the confidentiality of the investors. The confidentiality issue was

PwC, in consultation with the AHCC, designed a claim form and filing procedure specifically tailored to meet the needs of this case. Though they borrowed heavily from the Bankruptcy Code and the Bankruptcy Rules, they were not in fact limited by those provisions because, technically, none of those provisions applied as a matter of law to this case.[9] Thus, the called their claim forms "proofs of claim," but did not in fact follow the Official Form for proofs of claim used in U.S. bankruptcy proceedings. In addition, the procedure for submitting claims called for them to be sent to PwC at its various offices, rather than for them to be filed with the clerk of court (or any court, for that matter). The claims form made provision for identifying the source of investor claims as "internal" or "external" products. Investors identified themselves by account number. The forms and their instructions were delivered by courier to many claimants, and were translated into Spanish. In short, the parties specially tailored a claims filing process that resembled but did not fully track the claims process familiar to most U.S. bankruptcy lawyers.

The procedures designed by the parties also (predictably) called for a deadline by which claims had to be submitted, on pain of being barred from participating in any subsequent distribution. Bar dates are not at all uncommon in insolvency proceedings (or in any common fund process, such as probate proceedings and class action suits for example). Without them, an estate's fiduciary will not be able to arrive at the important number to plug into the denominator of the fraction that ultimately determines how much various claimants will receive in a case.[10] The fiduciary always needs a deadline with "teeth" lest the deadline only be honored in the breach. Precisely how the deadline (and its enforcement mechanism) will operate in a

the subject of this court's decision in *In re I.G. Services, Ltd.*, 244 B.R. 377 (Bankr.W.D.Tex. 2000), rev'd by *In re Blackwell*, 263 B.R. 505 (W.D.Tex.2000).

9. IGS was filed in the Cayman Islands. The companion case, it will be recalled, was filed in England, but was terminated in favor of the involuntary proceeding in the United States. However, by the agreement of the parties, no order of relief has to date been entered in that case. As a result, though there is an automatic stay applicable to such assets as IWG may have, arising under the U.S. Bankruptcy Code, there is not yet an estate administration pending in the United States (though an interim trustee has been appointed to protect assets). All that is pending in the bankruptcy court are the ancillary proceedings. This court is thus acting in this case only pursuant to the authority of section 304 of the Bankruptcy Code. The Fifth Circuit has observed that a court in a section 304 proceeding operates largely on an *ad hoc* basis, as the provisions of the Code (and its Rules) will only apply to the extent the court specifically orders. *In re Schimmelpenninck*, 183 F.3d 347, 352 (5th Cir.1999) ("The filing of a 304 petition does not create a bankruptcy 'estate' that must be administered by a court in the United States, but it does allow the foreign debtor to prevent piecemeal distribution of its assets in the United States while its plan is being structured in the foreign jurisdiction... One court has referred to section 304's grant of judicial authority as tantamount to the power to mold relief 'in near blank check fashion.' ") (citing *In re Culmer*, 25 B.R. 621, 624 (Bankr. S.D.N.Y.1982)). That is essentially what has happened in this case, with the court approving a procedure for handling claims that borrows from, but is not dictated by, the provisions of the Bankruptcy Code and its Rules.

10. The numerator of the fraction will be the total value of asset proceeds available for distribution. The resulting fraction yields the percentage recovery for purposes of *pro rata* distribution. Of course, this explanation oversimplifies the actual process, because the applicable insolvency regime (in this case, the Cayman Islands) will also set up various priorities of claimants, so that the fraction just discussed will only apply to the lowest level of claimants for whom assets are still available for distribution. Every priority claim higher will have been paid in full.

given case will depend on what law applies. In this case, the authority for creating the procedure was the Protocol, and it thus provided the reservoir of applicable law.

The deadline for filing claims in this case necessarily applied even to those investors who claimed to have proprietary rights to reclaim their investment portfolio. This was done with the agreement of all parties and only after notice to all interested claimants because no one really knew for certain whether the investors holding external products were in fact correct in their assertions. Indeed, it was not even clear which country's law would be applied to make the determination, or which court would be making the decision. Part of the overall structure for claims adjustment that PwC and the AHCC designed involved the appointment of an Examiner whose task it would be to look into these difficult legal issues and to prepare a report.[11] That report would then be disseminated to all interested parties, and would, hopefully, form the basis for extended negotiations both among investors and be-

tween the investors and the liquidators. The essential prelude to those discussions was an accurate registry that would tell everyone the exact amounts and categories claimed by the various investors.

The claims procedure contained the following essential features relevant to notice and the bar date:

1. Specifically referencing Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure, the court set November 15, 2000 as the bar date for filing proofs of claim by all creditors.[12] The proposed proof of claim form to be sent out to creditors contained the following language: "[t]his form must be received on or before November 15, 2000, or you will be forever barred from asserting or receiving payment for your claim(s) from I.G. Services and/or IWG Services, Ltd."

2. The following notice procedures were implemented—

a. PwC was to mail, by courier service or United States regular mail and by no later than September 15, 2000,, a copy of each of the following materials

**11.** The liquidators selected Jay Lawrence Westbrook, of the University of Texas School of Law, as the Examiner in this case. Professor Westbrook enjoys an international reputation as one of the premier experts in the area of international insolvency law. He was appointed by the court and completed his report in August 2000. The report analyzed the conflict of laws/choice of laws issues, criteria for proprietary claims, and other procedural issues involving the estates' property held by the liquidators. The report specifically focused on "external product" and "internal product" investments, and how each countries' law might treat these investments. Professor Westbrook concluded:

> Under any of the legal rules likely to be applied to the InverWorld investors, the [external product] investors will have proprietary rights or quasi-proprietary rights and many of those rights will represent some significant value. Under any of those legal rules, however, the [internal product] investors are highly unlikely to have pro-

prietary rights or quasi-proprietary rights of any significant value, but will be left with claims as general creditors.

Examiner's Report, at 59. However, at a hearing before this court on September 8, 2000, Professor Westbrook acknowledged that investors would ultimately best be served if they could reach a consensual arrangement for the distribution of assets. Without retreating from his own analysis, he pointed out that litigation over the merits of the numerous proprietary claims filed in these cases would pit investors against other investors in expensive and uncertain litigation likely to take at least five years to finally resolve. He also could not say with any certainty that courts would in fact rule consistent with his analysis.

**12.** Several other provisions of the Federal Rules of Bankruptcy Procedure were mentioned in the July 24 orders, but, with the exception of Rule 3003(c)(3), none of them pertained to the proof of claim process addressed under Rules 3002 and 3003.

to each known creditor of the estates: (a) the Notice of Commencement of Cases Under Bankruptcy Code and Fixing of Dates and (b) the proof of claim and instructions

b. PwC was to arrange to have the Notice to be published for (1) day, before September 15, 2000, in each of the following newspapers (and such other publications as PwC deemed appropriate): *The Wall Street Journal* (national and international editions); *The San Antonio Express; The London Times; USA Today* (national and international edition); *The Caymanian Compass; The Cayman Islands Gazette; El Financiero; El Universal; Reforma; El Mural; El Norte; E Manana de Matamoro;* and *El Sol de Aguascanlientes.*

The court found that the notice procedures constituted "due and adequate notice of the bar dates for all purposes with respect to all known and unknown creditors of the Trustees." On July 24, 2000, the court approved the proof of claim process and signed the three orders.[13]

Before September 1, 2000, a copy of the Investor Proof of Claim Form Packet, which included (i) an information page with a web site address for claim information; (ii) a cover letter in English and Spanish; (iii) the Notice of Commencement of the Case and Bar Date in English and Spanish; (iv) the Investor Proof of Claim Form, including an account statement from July 2, 1999; (v) the Investor Proof of Claim Form instructions in English and Spanish; (vi) Professor Westbrook's "Report of the Examiner" in English and Spanish; and (vii) a letter to the Investors dated September 1, 2000, in English and Spanish (the "Investor Proof of Claim Packet") was sent via Federal Express to PwC's offices in Mexico City, and in cities in Argentina and Venezuela. PwC then arranged for service of the packets on investors located in each of these countries. In fact, PwC arranged for delivery by courier on each of the investors listed. *See* Affidavit of Len Blackwell, Sept. 11, 2000.

As the November 15, 2000 bar date came and went, the liquidators, the AHCC, and other investors began trying to work out a global settlement agreement over the issue of internal and external products. Using the Examiner's Report as their starting point, the parties eventually agreed to distribute IGS assets through a series of phases and in varying amounts, with the holders of external products receiving preferential treatment but nonetheless sharing a portion of the distribution with the holders of internal products. The settlement was approved by this court, without objection, on March 27, 2001, after extensive notice to all investor claimants. Press coverage of the case assured that news of the settlement was published in newspapers in Mexico. Investors in Mexico have been closely watching the progress of this case by following the coverage in the Mexican press.

It is against this backdrop that we must view the requests for special intervention by Enrique Marcos, one of Inverworld's 1,500 investors. Marcos, a Mexican national from Monterrey and an Inverworld investor, learned of the settlement that would lead to imminent distribution to claimants—but only to those claimants who had timely filed claims. Marcos is the holder of Account No. 13081 which, according to the liquidators' Account Statement (dated July 2, 1999), had a face value of $250,926.47. The Account Statement re-

---

**13.** The parties knew that the Examiner's Report was not quite finished at the time of the hearing to approve these procedures was conducted. The parties anticipated that the Report would be completed in time to comply with the mailing deadline set out in the notice procedures.

veals that Marcos owns IWG notes (an internal product) of an estimated value of $57,000.00, 260 UMS sovereign bonds (an external product) having a face value of $260,000, and 50 Banobras Bank corporate bonds (an external product) with a face value of $50,000.00. Movant did not file a proof of claim before the bar date of November 15, 2000.

Marcos first argues that the court's bar date order is ambiguous because, while it referenced Rule 3003(c)(3) of the Bankruptcy Rules, it did specifically say whether the rest of that rule also applied. Marcos says that he assumed the balance of the rule *did* apply, and did not file a claim because subsection (b)(1) of that same rule excuses creditors and equity security holders in a chapter 11 case from filing a claim if the claim is already listed in "[t]he schedule of liabilities filed pursuant to § 521(1) of the Code ... [which schedule] shall constitute prima facie evidence of the validity and amount of the claims of creditors ..." *See* FED.R.BANKR.P. 3003(b)(2). Marcos said that he agreed with the Account Statement's estimation of his claim (the Account Statement was included in the Investor Proof of Claim Packet) so he did not file a proof of claim in this case. Marcos now asks the court to rule that his assumption was correct. He wants the court to rule that Rule 3003(b)(1) does indeed apply in this case.

Marcos argues alternatively that the language in the proof of claim form, purporting to forever bar an investor's claim if the investor fails to file its claim before the bar date, inappropriately divests investors of their proprietary rights (*i.e.*, the rights of the "external product" investors). Marcos says that these proprietary rights can only be divested by means of an adversary proceeding. *See* FED.R.BANKR.P. 7001.

As a final alternative argument, Marcos says that, even if the Order was clear, notice was proper and the Bar Date prop-

erly cut off the investors' propriety rights, Marcos untimely proof of claim should be allowed under the excusable neglect standard, articulated in *Pioneer Investment Services Co. v. Brunswick Associates, Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) and *In re Eagle Bus Mfg. Inc.,* 62 F.3d 730 (5th Cir.1995).

### DISCUSSION

The issues presented in this case are not so much complex as they are novel. We will discuss each issue as presented by Marcos at the hearing.

**1. Should this Court's Order Fixing Bar Date be "Clarified" to Implement Rule 3003(b)(1)?**

In a typical U.S. bankruptcy case, the proof of claim process is governed by Rules 3002 and 3003 of the Federal Rules of Bankruptcy Procedure. Rule 3002(c), which applies in chapter 7, 12 and 13 cases, for example, requires "unsecured creditors" and "equity security holders" to file a proof of claim no later than 90 days after the first date set for the meeting of creditors called under § 341 of the Bankruptcy Code. *See* FED. R. BANKR. P., Rule 3002(c). Failure to file a proof of claim within that 90–day window in any of these chapters results in the disallowance of the untimely claim. *See generally Matter of Waindel,* 65 F.3d 1307 (5th Cir.1995); *see also In re 50–Off Stores, Inc.,* 220 B.R. 897, 900 (Bankr.W.D.Tex.1998) ("Late claims are not, in the main, permitted in chapter 7 or chapter 13 cases, because Rule 9006(b)(2) expressly excludes application of the 'excusable neglect' standard to the deadlines set by Rule 3002(c)."); *see also* 11 U.S.C. § 502(b)(9) (making untimeliness a statutory ground for disallowance of claims).

Chapter 11 cases are governed by Rule 3003. The bar date for filing a proof of claim in these cases is generally set by the bankruptcy court, usually on a case by case basis. *See* FED.R.BANKR.P.

3003(c)(3).[14] A creditor in a chapter 11 case does not have to file a proof of claim if the claim is scheduled and if the debtor does not schedule the claim as "disputed, contingent, or unliquidated." *See* Rule 3003(b)(1) and (c)(2). If a claim is not scheduled, or the claim is scheduled as disputed, contingent, or unliquidated, then the creditor must file a proof of claim within the time frame set by the bankruptcy court or risk disallowance. *See* FED. R.BANKR.P. 3003(c)(2)–(3) ("any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purpose of voting and distribution").

Relying on this court's explicit reference to Rule 3003(c)(3) in its Order Fixing Bar Date, Marcos argues that the entirety of Rule 3003 should, in fairness, also apply. If it did, then Marcos could arguably rely on subsection (b)(1) of that rule, then argue that the liquidators' Account Statement (a copy of which was attached to the Proof of Claim forms) should count as "the schedule of liabilities filed pursuant to § 521(1) of the Code."[15]

Marcos's argument runs into a number of obstacles. First, this is a § 304 ancillary proceeding, not a chapter 7, 11 or 13 case. As earlier noted, there are virtually no rules that *must* apply in a § 304 ancillary proceeding (though they *may* apply if the court so decides). *See In re Schimmelpenninck,* 183 F.3d 347, 361 (5th Cir. 1999). The proof of claim process designed in this case was also designed *for* this case. It is as though the estate, in-stead of shopping for a new suit at Macy's, went to a custom tailor. Maybe the tailor used the same fabric you might find in a Macy's suit, but as a result of the custom work, you won't get the same fit.

The proof of claim process designed for this case employed Rule 3003(c)(3), which both compels the filing of a proof of claim (or, if "cause" is shown, the right to seek an enlargement of time pursuant to the Bankruptcy Rules) and permits the court to fix an enforceable deadline for filing claims. *See* FED.R.BANKR.P. 3003(c)(3). The process did *not* reference Rule 3002 (the rule that would generally govern a liquidation case such as this), nor for that matter did it reference the balance of Rule 3003. Indeed, the balance of the rules would have made for a "poor fit," because they key off such things as bankruptcy schedules and first meetings. There has been no first meeting in this case because this is primarily an ancillary action. The main case is pending in another country. There have not been any schedules filed in this case either because the main case is not pending here. Indeed, but for the specific directives of the Protocol, this court would not be involved in the claims process at all. The "tailors" in this case (PwC and the AHCC) chose to use the helpful and specific language found in Rule 3003(c)(3) because it aided the larger cause of setting a deadline for determining the precise parameters of claims against the estate, an important component of the claims administration process that was allocated to this court by the Protocol. The

---

**14.** In the Western District of Texas, a bar date is routinely set in all chapter 11 cases, and notice thereof is given to all creditors in the § 341 Notice, in a language, style, and prominence designed to meet the concerns raised in *Pioneer Investment. See 50–Off,* 220 B.R. at 900 n. 6.

**15.** Surprisingly, Marcos never argues that Rule 3003(b)(2) should apply. That provision states:

(2) List of equity security holders
The list of equity security holders filed pursuant to Rule 1007(a)(3) shall constitute prima facie evidence of the validity and amount of the equity security interests and it shall not be necessary for the holders of such interests to file a proof of interest. *Id.* Marcos could be considered an "equity security holder" for his "internal product" investments. *See supra* n. 5.

creative solution devised in this case is well within the "maximum flexibility" and "blank check" boundaries established by the Fifth Circuit in *Schimmelpenninck*. Nothing in that opinion forces a court in an ancillary proceeding to use *all* of the rules or even all of any specific rule.

Nor would it be correct to construe the Protocol as having tacitly incorporated all of Rule 3003, as Marcos argues. The portion of the Rule that Marcos wants to apply here, Rule 3003(b)(1), operates on the assumption that schedules have been filed in the case. No schedules have been filed in this case because this is an ancillary proceeding, not a full-blown bankruptcy case. It is not reasonable to think that either this court or the parties ever intended a Rule to apply, whose operation required as a predicate that schedules had been filed—for everyone involved knew that no schedules had been or would be filed. Despite Marcos's attempt to treat the Account Statement as a "proxy schedule," it was never intended as such. The Account Statement used by PwC in this case gave the liquidators an estimation of the number and kind of investor claims, and copies of the Account Statement were sent out with the Investor Proof of Claim Packet, but the Account Statement is what it is: a statement. It was never ratified under penalty of perjury, as bankruptcy schedules are, nor was it ever anyone's intention that it would be.

The forms included in the Investor Proof of Claim Packet made it clear that,

in fact, Rule 3003(b)(1) could *not* apply. The instructions stated: "If you agree with the Account Statement attached *you should record* the Net Worth amount from the Account Statement into the Total Claim Box below, and proceed to Section C." (emphasis added). Furthermore, the "Proof of Claim" form stated: "Creditors who desire to participate in the cases or share in the distribution must file their proofs of claim by the date set forth under 'DEADLINES.' " The clear import is that an investor had to file a claim *even if the investor agreed with the Account Statement.* Thus, the claims process, if anything, demonstrated that Rule 3003(b)(1) did *not* apply to this case—certainly not expressly and not *sub rosa* either, as Marcos argues. Marcos' reliance on Rule 3003(b)(1) was thus unfounded and does not furnish him a basis for failing to file a proof of claim by the deadline specified in the claims packet.

## 2. Can "propriety rights" be divested only pursuant to an adversary proceeding?

■ The next issue grows out of the fact that the claims bar deadline has the practical effect of cutting off Marcos' "proprietary rights" claims.[16] Marcos argues that that outcome effectively deprives him of property rights, and that, in order to achieve that end, the liquidators must bring an adversary proceeding pursuant to Rule 7001.[17]

---

**16.** The language in the proof of claim form states that "[t]his form must be received on or before November 15, 2000, or you will be forever barred from asserting or receiving payment for your claim(s) from I.G. Services, Ltd. and/or IWG Services, Ltd."

**17.** The Order instructing the Examiner to prepare a report defines a "proprietary claim" as "a claim of an ownership interest in a particular asset held by the liquidators such that the claimant is entitled to the asset or to all or

part of the proceeds of sale of that asset in preference to other claimants and the bankruptcy estate of InverWorld." *See* Examiners Report, at 4. The Examiner concluded that "[u]nder any of the legal rules likely to be applied to the InverWorld investors, the [external product] investors will have proprietary rights or quasi-proprietary rights and many of those rights will represent some significant value." Examiners Report, at 59. The liquidators' Account Statement, dated July 2, 1999, listed Marcos as owning IWG notes, an

Marcos's "property right" argument is unavailing. As detailed above, the governing law in this case is the Protocol, not the Federal Rules of Bankruptcy Procedure. Pursuant to the Protocol, all of the parties agreed to allocated the claims process to this court. This court then established a bar date by which all investor claims were to be filed. No party, including Marcos, objected to either the Protocol or the claim filing procedures implemented pursuant to the Protocol. It is simply too late for Marcos, who admittedly was given adequate and reasonable notice of the enactment of the Protocol and the proof of claim procedures implemented thereunder,[18] to now object to their effect.

More importantly, Marcos mistakenly assumes that it is the bar date established in this case [19] that has deprived him of his purported proprietary rights. It is not. If property rights have been divested in this case, they have been divested pursuant to the global settlement between the various claimant groups, consummated and approved by this court on March 27, 2001. As stated above, under the terms of the settlement agreement, the parties agreed to distribute IGS assets through a series of phases and in varying amounts, with the holders of external products (*i.e.*, proprietary rights claimants) receiving preferential treatment but nonetheless sharing a portion of the distribution with the holders of internal products. Marcos could have

objected to the settlement on the basis that it was depriving him of his property rights, but he did not. To the contrary, Marcos has repeatedly acknowledged in his pleadings and at the hearing that he applauded the terms of the global settlement agreement.[20] He has waived any objection he may have had to the "taking" of his property rights by agreeing with the terms of the settlement. The bar date does not do the "taking" here—the settlement does. The bar date keeps Marcos from *participating* in the settlement, that is true, but only because Marcos himself failed to take the simple steps that would have assured him of a seat at the table. If he has a complaint, it can only be that he was somehow deprived of adequate and proper notice to enable him to participate. That argument is taken up below.

### 3. Does Rule 9006(b)(1) apply in this case?

■ Marcos's final argument mirrors his first two. He argues that even if Rule 3001(b)(1) and Rule 7001 do not apply in this case, Rule 9006(b)(1) does (or ought to). Rule 9006(b)(1) permits a party who has not filed a timely claim to file a proof of claim *after* the bar date has passed if that party can show that its failure to timely act was a result of "excusable neglect." *See* Fed.R.Bankr.R. 9006(b)(1). The "excusable neglect" standard found in the rule arises in equity, and generally

---

"internal product," of an estimated market value of $57,000.00, 260 UMS sovereign bonds, an "external product," having a face value of $260,000 and 50 Banobras Bank corporate bonds, an "external product," having a face value of $50,000.00, none of which Marcos disputes.

**18.** This point is discussed more fully in part four of this opinion, below.

**19.** We note also that the proprietary rights' claims in this case have never been substantiated. As stated above, the primary purpose

for setting up the proof of claim process in this case was to verify the Account Statement in the liquidators' possession. And given the *Schimmelpenninck* court's "maximum flexibility" and "blank check" standards, it is not wholly unreasonable to require all investors, whether proprietary or not, in a transnational insolvency case such as this to comply with a proof of claim deadline.

**20.** It would be an odd result, indeed, to allow Marcos, who did not file a claim in this case, to attain a better position than if he did file a claim.

involves the following considerations: (1) whether there is a danger of prejudice to the debtor, (2) whether the length of the delay will have an adverse impact on the judicial proceedings, (3) whether the reason for the delay was within the reasonable control of the movant, and (4) whether the belated claimant acted in good faith. *See Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

■ We are not willing to apply Rule 9006(b)(1) (and its "excusable neglect" standard) in this case. By now it should be obvious that is the Protocol, not the Federal Rules of Bankruptcy Procedure, that governs this case. Furthermore, even if the Bankruptcy Rules were applicable in this case, Rule 9006(b)(1) only applies in chapter 11 cases:

> The "excusable neglect" standard of Rule 9006(b)(1) governs late filings of proofs of claim in Chapter 11 cases but not in Chapter 7 cases. The rules' differentiation between Chapter 7 and Chapter 11 filings corresponds with the differing policies of the two chapters. Whereas the aim of a Chapter 7 liquidation is the prompt closure and distribution of the debtor's estate, Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312–2313, 76 L.Ed.2d 515 (1983).

*Id.* at 389, 113 S.Ct. 1489. While this case is not a chapter 7 case as envisioned by the Bankruptcy Code (recall that the parties, by agreement, have asked this court not to rule on the chapter 7 involuntary petitions filed against the debtors in the summer of 1999), this case is unquestionably a liquidation case that does invoke the same concerns about "prompt closure and distribution" of the estate's assets as is found in chapter 7 proceedings. The same considerations that moved the drafters of the Bankruptcy Rules to limit Rule 9006(b)(1) so that it would not apply in chapter 7 liquidations move this court to rule that it should not apply here either. Thus, Rule 9006(b)(1) does not apply to this ancillary proceeding as a matter of law, and should not apply as a matter of equity.

### 4. Due process

■ There is one final issue that we must dispose, though it was not directly addressed by the parties at the hearing. We alluded to this concern in our earlier discussion of Marcos' proprietary rights argument, to wit, can Marcos be deprived of the opportunity to participate in the settlement simply because he failed to file a timely claim in this case. The quick answer is "of course," as this is precisely how chapter 7 liquidation cases work: a claimant must timely file a proof of claim, because the trustee makes distributions only to those creditors with allowed proofs of claim on file. *See* 11 U.S.C. § 726(a). Indeed, an even better analogy is found in the SIPC section of chapter 7, which applies to stockbroker liquidations. Section 752 requires that all investors—even those claiming proprietary interests in their portfolio—must file a timely claim as a predicate to distribution.[21]

The key to the legitimacy of these procedures is that the notification procedure devised and implemented must pass muster under the canons of due process appli-

**21.** The Securities Investor Protection Act of 1970 (SIPA), "which provides for the liquidation of bankrupt stockbrokers outside of the bankruptcy courts," and Subchapter IV—Commodity Broker Liquidation (sections 761– 766, of the Bankruptcy Code) both require an investor to file a claim in order to participate in any distribution. *See* 11 U.S.C. § 765(a) (Commodity Broker Liquidation); 15 U.S.C. § 78fff–2(a) (SIPA).

cable to the proceeding. The typical chapter 7 liquidation proceeding must comport with the various statutory due process protections built into the Bankruptcy Code and Rules, and must in addition comport with the due process requirements of the U.S. Constitution. *See In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 736 (5th Cir.1995). Our case is somewhat unique, in that it does not arise under a specific chapter of the U.S. Bankruptcy Code (it is instead a proceeding ancillary to a foreign proceeding pending in another country). Indeed, this court is presiding over the claims adjudication process only because the Protocol assigned that task to this court. The main case is a Cayman Islands case. The vast majority of the creditors are citizens of Mexico. Our task is to determine what due process rules apply, then to assure that the bar date set up in the claims procedure that was created pursuant to the Protocol comports with those due process rules. Deciding which rules apply could be a choice of law problem, but if the process passes muster under any applicable set of due process rules, then we will not need to resolve choice of law questions. Indeed, the UNCITRAL Model Law on Cross–Border Insolvency [22] suggests this as the most practical approach to be taken in situations such as this.

The Model Law "does not adopt substantive bankruptcy rules, but rather, provides a system of cooperation among the courts having jurisdiction over aspects of the assets and affairs of a multinational enterprise in financial distress." [23] Basic principles of the Model Law have already been adopted in Japan [24] and Mexico.[25] In addition, the United States,[26] Great Britain [27] and New Zealand,[28] among other countries, are actively considering its adoption. The Model Law is not yet bind-

**22.** U.N. Comm'n on Int'l Trade Law, Model Law on Cross–Border Insolvency with Guide to Enactment, U.N. Sales No. E.99.V.3 [hereinafter Model Law]; United Nations Commission on International Trade Law, 30th Sess., at 3, U.N. Doc. A/CN.9/442 (1997) [hereinafter Guide to UNCITRAL Model Law], reprinted in 6 Tul. J. Int'l & Comp. L. 415, 439 (1998); *see also* http://www.uncitral.org/english/texts/insolven/ml + guide.htm# 2. For the sake of simplicity, we will use the Model Law as a method of judging Marcos's claim against international standards. Other similar international standards can be found in the Concordat of the International Bar Association, *see* Int'l Bar Ass'n, Cross–Border Insolvency Concordat 1 (1995), the European Union Convention on Insolvency Proceeding, *see* European Union: Convention on Insolvency Proceedings, Nov. 23, 1995, 35 I.L.M. 1223 (1996) and the American Law Institutes Transnational Insolvency Project, *see* Am. Law Inst., Transnational Insolvency Project, Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement at 1 n. 2 (final approval, May 16, 2000) [hereinafter ALI Statement]; *see also* E. Bruce Leonard, *The American Law Institute's Transnational Insolvency Project*, 18 Am. Bankr. Inst. J. 34, 34 (Dec./Jan.2000).

**23.** *See* Jay Lawrence Westbrook, *A Global Solution to Multinational Default*, 98 Mich L. Rev. 2276, 2279 (2000).

**24.** *See* Hideyuki Sakai & C. Christian Jacobson, *The Japanese Bankruptcy Process Enters a New Era: Enactment of the Civil Rehabilitation Law*, 11 Newsletter of Comm. J. 3 (2000).

**25.** *See* Ley de Concursos Mercantiles y de reforma al articulo 88 de la Ley Organica del Poder Judicial la Federacion, Diario Oficial, May 12, 2000, at 10. Note that the Model Law was adopted in Mexico *after* the Inverworld case was commenced (1999).

**26.** *See* Bankruptcy Reform Act of 1999, H.R. 833, 106th Congress (1999) (passed by the House, 5/5/1999; passed by the Senate, in lieu of S. 625, 2/2/2000).

**27.** *See* Insolvency Bill [H.L.], available at <http:// www.parliament.thestationer.uk>.

**28.** *See* Mike Ross, *Insolvency Law Will Help Investors*, 2/18/99 Nat'l Bus. Rev., Feb. 18, 1999, available in 1999 WL 12335944.

ing precedent on this court, but its principles were developed by means of a rigorous process of debate, academic input and study, and careful vetting by expert organizations,[29] giving it a persuasive authority on a par with the various Restatements of Law issued by the American Law Institute over the years.

Article 13 of the Model law, entitled "Access of foreign creditors to a proceeding under [the law of the enacting State relating to insolvency]," provides:

1. Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under [the laws of the enacting State relating to insolvency] as creditors in this State.

2. Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [the laws of the enacting State relating to insolvency], except that the claims of foreign creditors shall not be ranked lower than [identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims].

*See* Guide to UNCITRAL Model Law, Article 13. Article 14 further provides:

1. Whenever under [the laws of the enacting State relating to insolvency] notification is to be given to creditors in this State, such notification shall also be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2. *Such notification shall be made to the foreign creditors individually, un-*less the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3. When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

(a) *Indicate a reasonable time period for filing claims and specify the place for their filing;*

(b) Indicate whether secured creditors need to file their secured claims; and

(c) *Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.*

*See* Guide to UNCITRAL Model Law, Article 13 (emphasis added). In short, the Model Law requires that foreign creditors be treated as a creditor of the enacting State would be treated, and, if appropriate, that "foreign creditors" be given notice of the proof of claim process in the relevant State as provided by Article 14(3). Thus, if the claim filing process in this case satisfies due process in each of the relevant "States," and if, further, the process complies with Article 14(3) of the Model Law (as applicable), then we can be comfortable that due process has been satisfied with regard to Marcos' claim. If due process is satisfied, then the bar date is enforceable against Marcos.

### A. United States

In the United States, an untimely claim may be allowed if disallowance of the claim would violate due process. *See e.g. Eagle Bus,* 62 F.3d at 736 ("A claimant may therefore file a late proof of claim if he can

---

**29.** *See* Daniel M. Glosband, *UNCITRAL'S New Working Group on Insolvency Law,* Am. Bankr. Inst. J. 28 (April 2000).

show that failure to allow the filing would be violative of due process."); *see also In re 50–Off Stores, Inc.*, 220 B.R. 897, 902 (Bankr.W.D.Tex.1998) ("Allowing late claims is permissible if disallowance would violate due process.") (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). In *Eagle Bus*, the Fifth Circuit stated that due process requires notice that is "reasonably calculated to reach all interested parties, reasonably conveys all of the required information, and permits a reasonable amount of time for response." *Eagle Bus*, 62 F.3d at 735 (citing *In re Robintech*, 863 F.2d 393, 396 (5th Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 55, 107 L.Ed.2d 24 (1989)).

Marcos has been accorded due process in this case under these standards. First, the Investor Proof of Claim Packet, previously described above, was reasonably calculated to reach all interested parties, including Marcos. On September 1, 2000, the liquidator sent a copies of the Investor Proof of Claim Form Packet, via Federal Express, to a PwC office in Mexico. The Mexico office, in turn, served a copy of the packet on each investor located in Mexico, including Marcos. This notification procedure was not only "reasonably calculated to reach all interested parties," it did in fact reach all interested parties.[30]

Second, the Investor Proof of Claim Packet (printed in both English and Spanish) included the following information: (i) an information page with a web site address for claim information; (ii) a cover letter in English and Spanish; (iii) the Notice of Commencement of the Case and Bar Date in English and Spanish; (iv) the Investor Proof of Claim Form, including an account statement from July 2, 1999; (v) the Investor Proof of Claim Form instructions in English and Spanish; (vi) Professor Jay Lawrence Westbrook's "Report of the Examiner" in English and Spanish; and (vii) a letter to the Investors dated September 1, 2000, in English and Spanish. The cover letter included in the proof of claim packet was a bright-pink piece of paper with the bolded title

## "IMPORTANT"

(that is 17 point type). The cover letter set out the bar date for all investor claim, and included a warning that claims not filed by November 15, 2000 would be "forever barred." In addition, the cover letter contained the following warning, also in 17 point type:

---

**30.** Generally this issue only arises if the creditor claims that she did not receive notice of the bar date. *See Eagle Bus*, 62 F.3d at 735 (notice by mail is adequate (as a means of delivery) if the notice is sent to the creditor's most recently known address; once it is sent, the presumption is in favor of adequacy, and a denial of receipt by the creditor does not rebut that presumption, although it does raise a fact issue). The facts of this case establish that Marcos did in fact receive the notification—though it appears that, because of his own internal office procedures, he might not have read it. Due process, of course, does not extend so far as to make it the sender's duty to assure that the receiver in fact reads what was sent.

# "THE INVESTOR CLAIM FORM MUST BE RECEIVED BY THE CLAIMS ADMINISTRATOR NO LATER THAN NOVEMBER 17, 2000 AT ONE OF THE FOLLOWING ADDRESSES."

The addresses were then listed below this warning. The reverse side of the pink paper included the same information printed in Spanish. The November 15, 2000 deadline was also to be found numerous other places in the Investor Proof of Claim Packet. The materials included in the Investor Proof of Claim Packet, including the multiple warnings made in the pink piece of paper, easily satisfy the "reasonably conveys all of the required information" test. *See Pioneer*, 507 U.S. at 397–98, 113 S.Ct. 1489 ("the bar date in a bankruptcy case should be prominently announced and accompanied by an explanation of its significance") (internal citations omitted).

Third, and finally, the Investor Proof of Claim Packet was received by Marcos in mid-September, approximately two months before the November 15, 2000 bar date. This date gave Marcos plenty of time to read through the proof of claim materials, compare his own records to the Account Statement (he has already told us that he agreed with the Account Statement), and send in his proof of claim in accordance with the instructions contained in the packet. That is easily a "reasonable amount of time" given the relatively simple duty imposed and the straightforward instructions contained in the materials. Indeed, it is worth noting that filing of the claim did not even require the sender to use international mail. PwC had set up a filing address in each country where there were claimants. The bar date procedure (and the concomitant disallowance of Marcos' claim for failure to meet that bar date) does not violate United States due process rules. What is more, those procedures easily satisfy Article 14(3) of the UNCITRAL Model Law.

## B. Cayman Islands

The due process requirements for notification of a claims bar date under Cayman Islands law appear to be more lenient than United States' requirements. Pursuant to Article 135 of the Cayman Islands Companies Act,

[t]here shall be published in the [Cayman] Gazette notice of—

(a) any resolution referred to in section 132(a) or (b) authorizing the winding up of a company; or

(b) the commencement of the winding up and dissolution of a company pursuant to section 133(1)(b) or section 200,

but failure so to publish the same shall not prejudice the validity of the commencement of the winding up and dissolution.

*Id.* (Revised 2000). As to setting a bar date for filing a claim against a debtor, Article 121 of the Companies Act states that "[t]he Court may fix a certain day or certain days on or within which creditors of the company are to prove their debts or claims, or to be excluded from the benefit of any distribution made before such debts are proved." *Id.* The Companies Act does not set forth a method by which a court must give notice of the bar date to either local or foreign creditors, however. All that appears necessary is for notice of the liquidation to be published in *The Cayman Gazette*, and for the court, in its discretion, to set a claims bar date. Presumably the court would then follow guide-

lines not dissimilar to those recommended in Article 14(3) of the Model Law to ensure that "foreign creditors" are apprised of the liquidation proceedings and the claims bar date.

In this case, the liquidators caused notice of the claims process to be published in both *The Caymanian Compass* and *The Cayman Gazette* before September 15, 2000. In addition, this court was well within its discretion to set a bar date by which claims had to be filed or forever "excluded." *See id.* at Art. 121. Finally, as recounted above, the liquidators sent out the comprehensive Investor Proof of Claim Packet to each investor, complete with proof of claim forms, detailed instructions on how to fill out the forms, and clear warnings to those claimants who did not file a proof of claim. These procedures more than satisfy the due process requirements of the Companies Act and Article 14(3) of the Model Law.

### C. Mexico

The notice provided in this case, and the proof of claim process created by the par-

ties, easily satisfies due process safeguards provided under Mexican law. Mexico, which enacted a new bankruptcy law in May 2000,[31] continues to permit "notice by publication" (as opposed to individual notice required by both the United States and international standards) and forever bars a claim that is not timely filed, regardless of the excuse. *See* Ley de Concursos Mercantiles, D.O., Title VI.[32] The prior law did not substantially differ on this point, and offered no greater protections. *See* Ley de Quiebras y Suspension de Pagos, article 16. Article 14(3) of the Model Law, which was adopted in Mexico *after* the Inverworld case was commenced, would probably not apply to Marcos anyway because he would not qualify as a "foreign creditor" in Mexico.

Under Mexican due process standards, as applied to the facts of this case, Marcos has not been deprived of due process. For instance, not only did the liquidators publish the claims bar date in numerous Mexican newspapers, as prescribed by Mexican law, but the liquidators also sent Marcos

---

**31.** Mexico's new Commercial Insolvency Law ("LCM") became effective May 12, 2000. *See* Ley de Concursos Mercantiles, D.O. (May 12, 2000); *see also* Barbara K. Morgan, *Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy*, AMERICAN BANKRUPTCY LAW JOURNAL, Fall, 2000, at 496–97. It is doubtful that the new bankruptcy law would apply in this case because this case was commenced prior to the enactment of the new law.

**32.** On commentator described the claims process as follows:

> Creditors must file their proofs of claim with the court within 20 days after the last day of publication of the notice of commencement of case. The conciliator must file with the court a preliminary list of claims that should be allowed and classified within 30 days after the last day of publication of the notice of commencement of case. The bankruptcy judge then serves the list on

> the debtor and the creditors, who then have five days to file any objections to claims. Ten days later, the conciliator must file his final list of allowable claims, and the bankruptcy judge will, five days later, issue his order setting forth the allowance, classification and priority of claims. The next day, the order concerning allowance of claims is published in the Judicial Journal or displayed in the courthouse. This order is final and appealable.

Josefina Fernandez McEvoy, Mexico's New Insolvency Act: Increasing Fairness and Efficiency in the Administration of Domestic and Cross-border Cases (Part I), 19 AMERICAN BANKRUPTCY INSTITUTE JOURNAL, July–August, 2000, 50–51. "The conciliator [similar to a trustee] may also include in the preliminary list any known claims not filed by the claimant. The conciliator must also annex to the list competent evidence to substantiate the claims, and include another list of claims that, in his opinion, should not be allowed." *Id.* at 51 n. 43.

individual notice of the claims bar date, which is *not* required under Mexican law. What is more, Marcos wholly failed to comply with the claims bar date. In Mexico, a creditor that does not file a claim loses that claim. *See id.* Thus, we conclude that even under Mexican standards of due process (more especially in fact), we have reached the correct result in this decision.

As the due process accorded Marcos meets the standards for due process that could apply in all of the relevant jurisdictions, we need not reach a choice of law question. Marcos' real objection, at the end of the day, was that his due process rights had somehow been violated by the strict enforcement of the bar date in the claims procedure created in this case. Whether we apply the standards of the United States, Mexico or the Cayman Islands, or instead apply the standards suggested in the UNCITRAL Model Law, or whether we instead attempt to divine a deontological principle of due process extracted from some body of universal law, Marcos has been accorded to due process. The bar date is thus enforceable and his claim is not allowed.

### Conclusion

For the foregoing reasons, the request of Marcos in this case to permit the late filing of his claim is DENIED.